# In the United States Court of Federal Claims

## No. 11-445C
### (Filed: December 4, 2013)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| TEKTEL, INC., | \* |
| Plaintiff, | \* |
| v. | \* |
| THE UNITED STATES, | \* |
| Defendant. | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Tucker Act, 28 U.S.C. § 1491(a)(1); Subject-Matter Jurisdiction; RCFC 12(b)(1); RCFC 12(b)(6); Privity of Contract; Schedule Contract; Exhaustion of Administrative Remedies; Monetary Claim; Default Termination; Termination for the Convenience of the Government.**

Cyrus E. Phillips IV, Albo & Oblon, L.L.P., Courthouse Plaza, 2200 Clarendon Blvd., Suite 1201, Arlington, VA 22201, for Plaintiff.

Stuart F. Delery, Jeanne E. Davidson, Martin F. Hockey, Jr., and Amanda L. Tantum, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Sigmund R. Adams, Administrative Office of the United States Courts, One Columbus Circle, N.E., Washington, D.C., 20544, Of Counsel.

_____

## MEMORANDUM OPINION AND ORDER[1]

_____

**Williams**, Judge.

This case arises from the Government's termination for cause of two purchase orders ("Orders") between Plaintiff Tektel, Inc. ("Tektel") and the United States District Court for the Northern District of Illinois ("District Court"). Tektel asks that the Court convert the default termination to a termination for the convenience of the Government and award Tektel $123,614.26 for equipment and services it provided the District Court prior to termination.

---

[1] The Court issued this opinion under seal on November 22, 2013, and directed the parties to file proposed redactions to the opinion by December 2, 2013. The parties did not propose any redactions, and the opinion is issued today without redactions, correcting errata.

This matter is before the Court on the Government's motion to dismiss Tektel's amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). The Government argues that the Court lacks jurisdiction because (1) there was no privity of contract between Tektel and the Government, (2) Tektel did not sufficiently allege a monetary claim, and (3) Tektel failed to exhaust its administrative remedies because it did not timely submit its claim. For the reasons that follow, the Court denies Defendant's motion.

## **Background and Findings of Fact Regarding Jurisdiction**[2]

Nortel's Prime Contract With The Government

The Federal Supply Schedule ("FSS") program "provides Federal agencies . . . with a simplified process for obtaining commercial supplies and services at prices associated with volume buying." FAR 8.402(a) (2008).[3] Under this program, the General Services Administration ("GSA") awards commercial firms indefinite delivery contracts, called schedule contracts, to provide supplies and services at stated prices for a fixed period of time. Id.; Def.'s Mot. Dismiss App. ("DX") 155, Apr. 16, 2013. These schedule contracts allow authorized federal entities, "ordering activities," to place orders directly with schedule contractors, instead of procuring supplies or services on the open market, while receiving most favored customer pricing/discounts. DX 155-56, 163; see FAR 8.401 (2008). To facilitate procurement under a schedule contract, a contractor must publish a "pricelist" that identifies the supplies and services, pricing, and terms and conditions for items covered by the contract. FAR 8.402(b).

In approximately December 2000, Nortel Network Inc. ("Nortel"), now Avaya Government Solutions, Inc., entered into a Federal Supply Schedule information technology contract ("Prime Contract") with GSA, contract number GS-35F-0140L. DX 048, 084; see also DX 115. The original contract period was from January 1, 2001 until December 31, 2005, and later extended to December 31, 2010. Id. at 069, 084. The Prime Contract "anticipated that most services [would] be provided by or through" Nortel's "representatives," who were authorized to represent Nortel and act on its behalf for purposes of ordering, order acceptance and fulfillment, and receipt of payment. Id. at 058, 063. Under the order placement and remittance clauses, the ordering activities were to direct all Prime Contract orders and payments to these representatives, also known as "schedule partners" or authorized dealers. Id. at 055-56.

The Prime Contract further stated:

---

[2] The parties and the Court rely on the appendices submitted in support of earlier motions -- the Government's May 31, 2012 motion to dismiss and January 8, 2013 motion for summary judgment -- as well as the appendices to the pending motion.

[3] The FSS program is also known as the General Services Administration Schedule Program, or the Multiple Award Schedule Program. FAR 8.402(a) (2008).

**C.6  Ordering (FAR 52.216-18) (Deviation-Jan 1994) (FCI Deviation-Dec 1997)**

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule.  Such orders may be issued during the contract term.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract.  In the event of conflict between a delivery order or task order and this contract, the contract shall control.

**C.16  Contractor's Billing Responsibilities (G-FCI-913) (Dec 1997)**

Where dealers are allowed by the Contractor to bill Government agencies and accept payment in the Contractor's name, the Contractor agrees to obtain from all dealers participating in the performance of the contract a written agreement which will require dealers to:

(1) Comply with the same terms and conditions regarding prices as the Contractor, for sales made under the contract;

(2) Maintain a system of reporting sales under the contract to the manufacturer which includes:

(a) the date of sale,

(b) the agency to which the sale was made,

(c) the product/model sold,

(d) the quantity of each product/model sold,

(e) the price at which it was sold, including discounts, and

(f) all other significant sales data;

(3) Be subject to audit by the Government, with respect to sales made under the contract; and

(4) Place orders and accept payment in the name of the Contractor, in care of the dealer.

An agreement between a Contractor and its dealers pursuant to this procedure will not establish privity of contract between dealers and the Government.

Id. at 053-54.  The Contract Disputes Act of 1978 as amended ("CDA") governed all disputes under the Prime Contract.  Id. at 052.

3

As required by Federal Acquisition Regulation ("FAR") 8.402(b), Nortel issued an Authorized FSS Information Technology Pricelist ("Pricelist") that itemized available voice and data telecommunication supplies and services and referenced Nortel's Prime Contract on each page.  Id. at 069-80, 084-97.  The federal entities authorized to order supplies and services through the Prime Contract were:

- Executive agencies;

- Other federal agencies;

- Mixed-ownership government corporations;

- The District of Columbia;

- Government contractors authorized in writing by a federal agency pursuant to 48 C.F.R. § 51.1; and

- Other activities and organizations authorized by statute or regulation to use GSA as a source of supply.

Id. at 053.  A "federal agency" included "an establishment in the . . . judicial branch of the Government . . . ."  40 U.S.C. § 102(5) (2006).  According to GSA, the Administrative Office of the United States Courts and the federal courts were not federal agencies within the executive branch of the government, but were authorized as "other federal agencies" to use GSA sources of supply and services.  DX 162-63, 168.

Nortel's Pricelist included a list of the schedule partners' "Ordering, Billing, Warranty, and Remittance Offices," and identified the schedule partners as the representatives Nortel would use for "fulfillment of [Nortel's] GSA Schedule orders."  Id. at 076-80, 088-91.  If an ordering activity placed an order with a schedule partner, the ordering activity was required to submit payments to these schedule partners in Nortel's name, in care of the schedule partner.  Id. at 088.[4]

Nortel's Pricelist also stated in pertinent part:

Any ordering office, with respect to any one or more delivery orders placed by it under this contract, may exercise the same rights of termination as might the GSA Contracting Officer under provisions of FAR 52.212-4, paragraphs (1) Termination for the ordering activity's convenience, and (m) Termination for Cause (See C.1.).

---

[4]  The only reference in the Pricelist regarding placing orders directly with Nortel stated, "Orders placed directly with Nortel Networks [would] require FAR Part 6.3 justification" -- justification for "contracting without providing for full and open competition."  DX 088; see also FAR subpart 6.3 (2008).

Def.'s Notice of Filing App. 24, Jan. 8, 2013.

<u>Tektel Becomes Nortel's "Schedule Partner"</u>

Plaintiff Tektel is a Kentucky-based closely-held for-profit corporation that provides information technology solutions, including converged telecommunications and data networking. On or about August 15, 2008, Nortel entered into a "Sponsored GSA Schedule Partner Agreement" ("Partner Agreement") with Tektel, authorizing Tektel to "represent Nortel Networks for sales under its [FSS] IT Contract number GS-35F-0104L" as a "sponsored partner."  DX 098.  The Partner Agreement required Tektel to:

> comply with all terms and conditions of the Prime Contract as they appl[ied] to orders issued under the Prime Contract, including but not limited to, order acceptance, order processing, invoicing, warranty, maintaining sales records, and all Prime Contract flowdowns attached to this Agreement.  All Orders [were to] be governed by and [could not] alter the terms and conditions of this Agreement.

<u>Id.</u>  The referenced "flowdowns" were a list of terms and conditions from the Prime Contract that flowed down to schedule partners like Tektel.  <u>Id.</u> at 103.  In total, the Partner Agreement identified 106 flow-down clauses.  <u>Id.</u> at 103-06.  One such clause, FAR 52.216-18, provided that a schedule partner would furnish an ordering activity with supplies and services under Nortel's Prime Contract after the ordering activity issued the schedule partner a delivery or task order.  <u>Id.</u> at 053.  This clause further clarified that all orders would be subject to the terms of the Prime Contract.  <u>Id.</u>  Orders placed under Nortel's Prime Contract could "be purchase orders, delivery orders, task orders, or any other order issued against the Prime Contract," and were to e invoiced "in accordance with the terms of the Prime Contract."  <u>Id.</u> at 098-99.

In addition, the Partner Agreement stated, "This Agreement does not create privity of contract between [the] Sponsored Partner and the government."  <u>Id.</u> at 101.

<u>The United States District Court Issues Two Requests For Quotes</u>

On or about July 16, 2009, the United States District Court for the Northern District of Illinois issued a Request for Quote ("RFQ") seeking vendor quotes for a phone maintenance service project ("July RFQ").  <u>Id.</u> at 029.  On or about September 8, 2009, the District Court issued a second RFQ for the purchase and installation of new telephone equipment, along with a one-year phone maintenance service with three option years ("September RFQ").  <u>Id.</u> at 008.

Both RFQs stated:

- The maintenance quotation would follow the terms and conditions of the Nortel Networks General Services Schedule Number GS-35F-0140L, Nortel's Prime Contract;

- The District Court would "base the award for this work [on] the lowest price technically acceptable vendor" that met all the requirements in the project description;

- Vendors were to submit pricing using Nortel's Prime Contract Number;

- The District Court could require "local technicians" working on the account to undergo and pass a background investigation, including, but not limited to, a comprehensive criminal background and fingerprint check; and

- To submit a quotation on either RFQ, vendors were to complete a "mandatory worksheet" form included with each RFQ and submit the worksheet with their quotation. Each worksheet required vendors to identify whether they were providing their quotation under Nortel's Prime Contract.

Id. at 008-15, 029-34.

Each RFQ included a section called "Purchase Order Terms and Conditions (Apr 2001)" that incorporated the Federal Acquisition Regulation by reference, including "FAR 52.249-8 (Apr 1984)" (regarding default under a fixed price supply and services order) and "FAR 52.249-1 (Apr 1984)" and "52.249-4 (Apr 1984)" (regarding termination for the convenience of the government for supplies and services, respectively). Id. at 017, 036. FAR 52.249-8 stated in pertinent part:

(a)     (1) The Government may . . . by written notice of default to the Contractor, terminate [a] contract in whole or in part if the Contractor fails to . . . (iii) Perform any of the other provisions of this contract . . . .

* * *

(f)     The Government shall pay contract price for completed supplies delivered and accepted. The Contractor and Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property. Failure to agree will be a dispute under the Disputes clause.

* * *

(g)     If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

Under FAR 52.249-4, if a contracting officer terminates a contract for the convenience of the Government, the Government is liable for payment for services rendered before the effective

date of termination.  The RFQs' "Purchase Order Terms and Conditions (Apr 2001)" also included a "Disputes Clause (AOUSC 1999)."  Id. at 016, 035.

Tektel Submits Quotations In Response To Both RFQs

Tektel submitted a quotation for the July RFQ and confirmed on its accompanying worksheet that its quote was provided under Nortel's Prime Contract.  Id. at 032-34.  In a letter to Tektel dated September 8, 2009, a District Court procurement clerk acknowledged receipt of Tektel's quote, and enclosed a copy of the September RFQ.  Pl.'s Reply Mot. Dismiss App. ("PX") 000001, Aug. 11, 2012.  The procurement clerk indicated that Tektel's quote in response to the July RFQ "remained active and allow[ed] for a price adjustment" if Tektel chose to bid on the September RFQ.  Id.  Tektel submitted a quotation in response to the September RFQ, but the record does not include a copy of the worksheet Tektel submitted with this quotation.  Id. at 000023.

The District Court Awards Tektel The Work Referenced In Both RFQs

In a letter to Tektel dated September 30, 2009, the District Court's Manager of Administrative Services, identified elsewhere as the District Court's contracting officer, informed Tektel that the District Court had "awarded [Tektel] the Nortel phone switch upgrade work and the yearly maintenance contract as defined in the request for quote dated September 8, 2009" via a purchase order for the firm fixed price of $135,917.18.  PX 000023; DX 001, 006.[5] The Pricelist expressly stated that orders for this equipment "shall only be placed" with a schedule partner, such as Mid-Atlantic Business Communications, Inc., Prime Communications, Inc. or Tektel.  DX 090-91, 096.

In this September 30, 2009 letter, the contracting officer further advised that since the "phone maintenance/partner hours" would begin on October 1, 2009, the District Court would issue Tektel a purchase order for the "maintenance/phone hours" project -- the work defined in the July RFQ -- "once the fiscal year beg[an]."  PX 000023.  The contracting officer confirmed the firm fixed price for this order at $48,857.40 and advised Tektel to use this letter as a "notice to proceed" with this work.  Id.

Coinciding with the September 30, 2009 letter from the contracting officer to Tektel, the District Court's Space and Procurement Administrator emailed Tektel's president an agenda for a telephonic conference scheduled the same day to discuss the Orders.  Def.'s Reply Mot. Dismiss App. 44, Sept. 6, 2012.  This agenda referred to substantive details of the work Tektel was to perform for the District Court and information regarding the applicable background check

_____

[5]  The "Nortel phone switch" referenced in the District Court's letter to Tektel -- the equipment upgrade Tektel was to perform for the District Court -- refers to telephone equipment, not to the contractor Nortel Networks, Inc.  See DX 001, 084, 096, 102 (referencing the availability and sale of, and the authority to sell, Nortel Network, Inc. equipment known as "CS1000/M1" or "Communications Server 1000/Meridian 1," the same equipment sought by the District Court in its September RFQ).

procedures for the Tektel technicians slated to work at the District Court.  Id.; see DX 009, 030.  The administrator's email to Tektel also included a copy of the purchase order the District Court issued for the work defined in the September RFQ, and instructed Tektel's president to "sign and complete box numbers 25, 26, and 27 and email the fully executed purchase order as soon as you can."  Def.'s Reply Mot. Dismiss App. 44.

The District Court Issues Two Delivery/Task Orders

The District Court issued Tektel a "non-judiciary wide" "Delivery/Task Order" for each project -- an order dated September 29, 2009, corresponding to the September RFQ ("September Order"), and an order dated October 13, 2009, corresponding to the July RFQ ("October Order").  DX 001-07.  Each Order was on an Administrative Office of the United States Courts order form, AO FAS4T Form 347 (Rev 02/2009), and identified the contract number as Nortel's Prime Contract, the "contractor" as Tektel, and the contracting officer as the District Court's Manager of Administrative Services.  Id. at 001, 006.  The Government claims that the "district court's insertion of Tektel's name in the 'contractor' box in a purchase order, rather than explaining that Tektel was acting upon behalf of Nortel, [was] no more than a scrivener's error . . . ."  Def.'s Mot. Dismiss ("Motion") 12 n.9, Apr. 16, 2013 (citations omitted); Tr. 14:10-18, 58:10-15, Sept. 20, 2012.  However, the record contains no evidence of any scrivener's error.

The District Court's contracting officer approved and signed the September and October Orders on September 29, 2009 and October 20, 2009, respectively.  DX 001, 006.  Tektel's president executed the September Order on September 30, 2009, and the October Order on October 21, 2009, each time signing in box 25 in the space designated for "contractor/vendor (option for bilateral signature)."  Id.  The Orders included a list of "Required Provisions and Clauses for All Delivery/Task Orders Placed Against Non-Judiciary Contracts" that incorporated "JP3 Clause 7-235, Disputes (Jan 2003)" by reference.  DX 002, 007.[6]  This clause stated in pertinent part:

(a) A contract dispute means a written claim, demand or assertion by a contracting party for the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other specific relief arising under or relating to the contract.

(b) A contract dispute shall be filed within 12 months of its accrual and shall be submitted in writing to the contracting officer.  The dispute shall contain a detailed statement of the legal and factual basis of the dispute and shall be accompanied by any documents that support the claim.  The claimant shall seek specific relief, as provided in paragraph (a) above.  However, the time periods set forth here shall be superceded if the contract contains specific

---

[6]  The September Order also repeated the "Purchase Order Terms and Conditions (Apr 2001)" recited in both RFQs, including the "Disputes Clause (AOUSC 1999)," and the incorporation by reference of FAR 52.249-8 regarding default and FAR 52.249-1 and 52.249-4 regarding termination for the convenience of the Government.  DX 001-04.

provisions for the processing of any claim which would otherwise be considered a dispute under this clause.

(c) Contracting officers are authorized to decide or settle all disputes under this clause.   If the contracting officer requires additional information the contracting officer shall promptly request the claimant to provide such information.   The contracting officer will issue a written determination within 60 days of the receipt of all the requested information from the claimant.   If the contracting officer is unable to render a determination within 60 days, the claimant shall be notified of the date on which a determination will be made. The determination of the contracting officer shall be considered the final determination of the judiciary.

Def.'s Suppl. Mot. Dismiss App. 10-11, Jan. 8, 2013.

<u>The District Court Issues A Small Purchase Open Market Order</u>

In November 2009, the District Court issued Tektel a third order dated November 6, 2009, also signed by Donna Carey, the same contracting officer who signed the September and October Orders.   PX 000028.   In contrast to the earlier Orders, the November order did not reference the Prime Contract but rather listed the transaction as an "open market small purchase" order.   <u>Id.</u>[7]

<u>The District Court Terminates The September And October Orders For Cause</u>

Pursuant to the Orders, Tektel configured what it characterized as custom telephone equipment, software, and software upgrades for the District Court.   <u>See</u> Am. Compl. ¶ 3.   Tektel also began installing and monitoring the telephone switch.   <u>See id.</u>

In a letter to Tektel dated March 1, 2010, the District Court's Clerk of Court notified Tektel that the Clerk had received a background investigation report regarding Tektel's suitability to be a "contractor."   PX 000053.   Specifically, the investigation indicated that Tektel's president had been convicted of a drug-related felony charge, and before the Clerk could deem Tektel suitable to continue as a District Court "contractor," the Clerk required a written response from Tektel by March 16, 2010, regarding the accuracy of the alleged felony charge. <u>Id.</u>   The Clerk did not identify himself as a contracting officer.   <u>Id.</u> at 000024-29, 000053.

On March 5, 2010, Tektel's president emailed the Clerk a response stating that his offense had been "amended," he had never been convicted of a felony, and Tektel was doing

---

[7]   Like the September and October Orders, the District Court canceled the November 6, 2009 purchase order for cause based on the alleged felony conviction of Tektel's president.   <u>See</u> DX 172.   Tektel does not allege any claims related to, or damages arising from, this cancelation. Am. Compl.

business with other federal agencies that had performed background checks and granted Tektel "security clearance to perform [its] duties." Id. at 000054.

On March 8, 2010, the Clerk emailed Tektel's president a response stating, "If you have the amended charges or complaint indicating this was not a felony, please advise. The background check shows trafficking of narcotics, which is a felony." Id. at 000055. The Clerk did not give Tektel a deadline for providing this information. See id.

On March 17, 2010, Tektel's president emailed the Clerk, responding:

[I] have received additional information from the Kentucky court system clarifying the criminal charge against me is a misdemeanor and not a felony offense. The case number and Kentucky Revised Statute(KRS) [sic] is listed below:

Case #89-CR-00128
KRS 218A.140(1), UOR Code 35300-1 (Class A misdemeanor)

If this is not enough information, please let me know and I will do my best to get it to you.

Id.

In a letter dated March 18, 2010, the Clerk canceled Tektel's "contract" for cause, addressing this termination letter solely to Tektel and stating:

I previously gave you until March 16, 2010 to provide any documentation necessary to clarify this issue. You provided two e-mails informing me that this was not a felony, but you have provided no documentation. The contract with your firm is considered highly sensitive. I have consulted with the Court, and the Court has more stringent policies than other government units.

I am hereby cancelling the contract for cause, effective at the close of business on Friday, March 19, 2010.

PX 000056. The District Court did not copy Nortel on this letter. Id. The record is silent on when Tektel received this letter, although a notation on the letter stated that delivery was "via federal express overnight mail, signature required." Id.

On March 19, 2010, Tektel's president spoke with the Clerk via telephone, and the Clerk informed him that the District Court was canceling Tektel's contract for cause based on his felony conviction. Id. at 000059. That same day, before the close of business, Tektel's president emailed the Clerk a copy of an order dated August 15, 1991, from a Kentucky circuit court finding Tektel's president guilty of a misdemeanor. Id. at 000059-61. In this order, the Kentucky circuit court amended the indictment against Tektel's president from a felony to a misdemeanor, and found him guilty of a "Class A misdemeanor, as amended." Id. at 000060-61.

10

Tektel's president also explained in this email that he had submitted a security clearance application to the District Court for purposes of assisting the Tektel technical staff working on the District Court's premises "as needed." Id. at 000059. He requested that, if his application for clearance was denied, the District Court allow Tektel to continue its work. Id. The record does not contain a response from the District Court to Tektel's March 19, 2010 email.

In a letter dated April 15, 2010, the Clerk advised Nortel that:

[T]he District Court for the Northern District of Illinois canceled the purchase order with Tek Tel Technologies [sic] for cause. There was an issue related to the Court's stringent security requirements for people working on the Court's telephone system.

Id. at 000062. By a letter dated June 7, 2010, Nortel's successor, Avaya Government Solutions, Inc., gave Tektel a 30-day notice of Avaya's intention to terminate the Partner Agreement for convenience. DX 115.

Tektel Files For Bankruptcy And Sends The District Court A Claim

On January 25, 2011, Tektel filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. In re Tektel, Inc., No. 11-30348 (Bankr. W.D. Ky. filed Jan. 25, 2011).

By letter dated March 17, 2011, Tektel submitted a claim challenging the District Court's cancelation, and requested a "final decision" from the District Court's Manager of Administrative Services, the District Court's contracting officer, stating:

Tektel . . . is disputing and hereby requesting that a final decision be issued regarding the Clerk of Court's . . . notice to cancel Tektel's contract with th[e] U.S. District Court for cause, effective at the close of business on Friday, March 19, 2010.

There was not sufficient justification to terminate for cause and termination procedures were not properly followed; therefore the termination was for convenience.

The Clerk of Court's notice to cancel Tektel's Contract was a violation of 41 U.S.C. § 605(a) in that the Clerk of Court has made a Claim against Tektel that "shall be the subject of a decision by the contracting officer." The Clerk of Court is not the Contracting Officer.

Because Tektel is in Chapter 11 reorganization, please expedite this request so we can move forward.

Tektel will consider the failure of the Contracting Officer to issue the final decision required by 41 U.S.C. § 605(a) as the Contracting Officer's adoption of the Claim asserted by the Clerk of Court, and Tektel will consider such inaction sufficient for Tektel to bring an Action directly in the United State Court of Federal Claims, . . . as authorized by 41 U.S.C. § 609(a)(1).

DX 172.

Tektel sent its claim via certified mail on March 18, 2011.  Def.'s Mot. Summ. J. ("Summ. J.") App. 013, Jan. 8, 2013.  Tektel mailed this letter from Elizabethtown, Kentucky, but the United States Postal Service did not deliver the letter to the District Court in Chicago, Illinois until March 31, 2011, almost two weeks later.  Id. at 013-16.  The record is silent regarding the circumstances of this delivery delay.

On April 6, 2012, the bankruptcy court dismissed Tektel's bankruptcy case.  In re Tektel, Inc., No. 11-30348, ECF No. 69.

## Procedural History

Tektel filed the instant suit on July 7, 2011, challenging the District Court's cancelation of the Orders.  Compl. ¶¶ 1, 3, a.[8]  Tektel invoked jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006), appealing the District Court's termination pursuant to the Disputes Clause (AOUSC 1999) incorporated into the September and October Orders.  See id. at ¶¶ 9-10; Tr. 55:8-10.[9]  Tektel sought a judgment from the Court declaring that:

(1) "by reason of the terms and conditions incorporated into the [Orders], it [was] discretionary, not mandatory, that proposed technicians pass a background investigation . . . ;"

(2) the same terms and conditions did not mandate that "a Contractor's Officers" pass a background investigation;

(3) the cancelation of the Orders by the District Court's Clerk was arbitrary, capricious or an abuse of discretion since Tektel's president had not been convicted of a felony;

(4) the misdemeanor conviction of its president did not qualify as a default of any of Tektel's obligations under the Orders; and

---

[8]  Tektel received permission from the bankruptcy court to employ counsel to pursue claims in the Court of Federal Claims.  In re Tektel, Inc., No. 11-30348, ECF No. 29.

[9]  Tektel and the Government agree this matter is not subject to the Contract Disputes Act because the District Court is not an executive agency.   Tr. 32:25-33:1, 33:18-20, 50:24-51:3, 55:2-5.

(5) Tektel did not default under the Orders, or alternatively, Tektel's default was excusable, and the rights and obligations of the parties should be determined as if this cancelation had been issued for the convenience of the Government, "thereby entitling Tektel to an equitable adjustment, and not a forfeiture of Tektel's rights."

Compl. ¶ 3.

On May 31, 2012, the Government filed a motion to dismiss Tektel's complaint for lack of subject-matter jurisdiction citing a lack of privity between Tektel and the District Court, Tektel's failure to seek monetary relief, and Tektel's "potential" failure to comply with dispute provisions in the RFQs and the Orders.  Def.'s Mot. Dismiss 7-20, May 31, 2012.

After the oral argument on the Government's motion, Tektel filed a motion for leave to amend its complaint to cure the jurisdictional issues raised by the Government.  The Government opposed Tektel's motion to amend the complaint and filed a motion for summary judgment, alleging that Tektel's March 17, 2011 claim letter to the District Court was untimely and that Tektel had failed to exhaust its administrative remedies.  Summ. J. 1.  On February 21, 2013, the Court granted Tektel's motion for leave to amend its complaint, rendering the Government's motions for dismissal and summary judgment moot.

In its amended complaint, Tektel requests the same declaratory relief it sought in its original complaint, as set forth above.  In addition, Tektel seeks:

as an equitable adjustment, (a) $121,136.76 for the custom-configured telephone switch, software, and software upgrades which Plaintiff Tektel delivered, and then retrieved, from the United States District Court for the Northern District of Illinois, (b) $1,757.50 for installation labor performed for this custom-configured telephone switch before the express Purchase Order Contracts were terminated, and (c) $720.00 incurred for a service to perform real-time electronic monitoring of this custom-configured telephone switch.

Am. Compl. ¶ 29.

On April 16, 2013, the Government filed the subject motion to dismiss the amended complaint.  The Government's motion raises four issues:

1.  Whether this Court lacks jurisdiction to entertain the amended complaint given that Tektel is not in privity of contract with the United States.

2.  Whether Tektel failed to exhaust its administrative remedies by not timely submitting a claim to the contracting officer.

3.  Whether Tektel sufficiently alleged a monetary claim.

4.  Whether the claimed $121,136.76 in costs for equipment that Tektel retrieved from the District Court are unallowable such that Tektel failed to state a claim for recovery of this amount.

Motion 2.

## **Discussion**

<u>Jurisdiction</u>

The Tucker Act grants this Court jurisdiction to hear claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . . ." 28 U.S.C. § 1491(a)(1) (2006). The Act provides a waiver of sovereign immunity enabling a plaintiff to sue the United States for money damages. <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983); <u>Reid v. United States</u>, 95 Fed. Cl. 243, 247 (2010) (citation omitted).

<u>Rule 12(b)(1)</u>

Subject-matter jurisdiction can be challenged at any time by the parties, or raised by the Court *sua sponte*. <u>Folden v. United States</u>, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citation omitted). The party seeking jurisdiction bears the burden of establishing jurisdiction by a preponderance of the evidence. <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936); <u>Reynolds v. Army & Air Force Exch. Serv.</u>, 846 F.2d 746, 748 (Fed. Cir. 1988) (citations omitted). "[T]he law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." <u>Total Med. Mgmt. v. United States</u>, 104 F.3d 1314, 1319 (Fed. Cir. 1997) (citation omitted). As part of its jurisdictional analysis, the Court accepts as true all factual allegations in the complaint and construes "all reasonable inferences in plaintiff's favor." <u>Henke v. United States</u>, 60 F.3d 795, 797 (Fed. Cir. 1995); <u>see also</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overruled on other grounds</u>, <u>Davis v. Scherer</u>, 468 U.S. 183 (1984).

When a Rule 12(b)(1) motion challenges the factual basis for subject-matter jurisdiction, the allegations in the complaint are not controlling, and the Court may review evidence outside the pleadings to determine jurisdiction. <u>Cedars-Sinai Med. Ctr. v. Watkins</u>, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993); <u>see also</u> <u>Moyer v. United States</u>, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (citation omitted) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged."). "Indeed, the court may, and often must, find facts on its own." <u>Martinez v. United States</u>, 48 Fed. Cl. 851, 857 (2001) (citing <u>RHI Holdings, Inc. v. United States</u>, 142 F.3d 1459, 1461-62 (Fed. Cir. 1998)). "[T]he party asserting jurisdiction must be given an opportunity to be heard" to present "competent proof" and affirmatively demonstrate that the Court has jurisdiction. <u>Reynolds</u>, 846 F.2d at 748 (citing <u>Local 336, Am. Fed'n of Musicians, AFL-CIO v. Bonatz</u>, 475 F.2d 433, 437 (3d Cir. 1973)); <u>McNutt</u>, 298 U.S. at 189 ("If [the plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof.").

If at any time the Court determines it lacks subject-matter jurisdiction, the Court must dismiss the action. <u>Stuart v. United States</u>, 100 Fed. Cl. 74, 76 (2011); RCFC 12(h)(3).

Rule 12(b)(6)

When deciding a motion to dismiss under RCFC 12(b)(6), the Court considers whether the pleadings satisfy RCFC 8. Pursuant to Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see generally Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (construing Rule 8 of the Federal Rules of Civil Procedure, which is identical to RCFC 8). Rule 8 demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." Id. (quoting Twombly, 550 U.S. at 570). To determine whether a complaint states a plausible claim for relief, the Court must engage in a context-specific analysis and "draw on its judicial experience and common sense." Id. at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556). However, the plausibility standard requires more than a "sheer possibility" that the defendant violated the law. Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). The complaint must plausibly suggest the plaintiff has a right to relief "above the speculative level" and "across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570.

Privity of Contract

To maintain a contract claim pursuant to the Tucker Act, a plaintiff must have privity of contract with the Government. Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990); Chancellor Manor v. United States, 331 F.3d 891, 899 (Fed. Cir. 2003). "The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity." Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998). "In other words, there must be privity of contract . . ." because the United States "consents to be sued only by those with whom it has privity of contract." Id.; Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1263 (Fed. Cir. 2005) (quoting Erickson Air Crane Co. of Wash., Inc. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984)). "Absent privity between [plaintiff] and the [G]overnment, there is no case." Katz v. Cisneros, 16 F.3d 1204, 1210 (Fed. Cir. 1994) (citation omitted).

Tektel contends that both the September and October Orders were express contracts between Tektel and the District Court. The Government counters that the Orders were issued under the terms of Nortel's Prime Contract, and that as a schedule partner under the Prime Contract, Tektel was authorized to act on behalf of Nortel, but did not itself have privity of contract with the Government. The Government premises its argument on boxes two and 13 of each Order. In box two, the District Court identified the contract number as that of Nortel's Prime Contract. In box 13, the District Court identified the "type of order" as a "non-judiciary

wide contract including GSA Federal Supply Services and schedule contracts (terms and conditions attached)" delivery/task order.  DX 001, 006; Tr. 5:21-6:4.

In focusing on references to Nortel's Prime Contract in both Orders, the Government asks the Court to ignore the District Court's express designation of Tektel as the "contractor" in box nine.  Without any supporting evidence, the Government contends this designation was no more than a scrivener's error.  In essence, the Government urges the Court to correct the unproven scrivener's error by reading out the express designation of Tektel as the contractor in box nine, and to give meaning only to Nortel's contract number in box two and the cryptic order description in box 13 referencing the FSS contract.  As such, the Government asks the Court to conclude that the Orders were issued under the terms and conditions of Nortel's Prime Contract and its Pricelist, Nortel was the contractor, Tektel was Nortel's representative, and Tektel did not have privity with the Government.

However, the dearth of evidence of the scrivener's error advocated by the Government prevents the Court from finding such an error.  As the Court commented during the hearing on the Government's first motion to dismiss, "Nowhere in [the] record does the term scrivener's error appear.  I have no testimony.  I have no documentation.  I have no basis whatsoever on which to enter a factual finding in support of my decision under 12(b)(1) on jurisdiction, which of course requires a factual predicate." Tr. 14:11-18, 58:10-15.  Defendant never attempted to remedy this factual void.  Following this hearing and Tektel's filing of an amended complaint, the Government filed two dispositive motions, the subject motion and a motion for summary judgment.  In support of its motion for summary judgment, the Government submitted a declaration from the District Court's contracting officer -- the same contracting officer who signed the Orders naming only Tektel as the contractor -- but that contracting officer never mentioned the scrivener's error.  Summ. J. App. 015.  In addition, there is no reference to this scrivener's error in the 184-page appendix the Government filed in support of the subject motion, or any of the appendices filed by the parties in support of earlier motions.  See DX 1-184.  As such, there is no factual predicate to support a finding that the Orders' references to Tektel as the contractor were scrivener's errors.

In contrast to the suggestion that Tektel was not a contractor, the course of dealing between Tektel and the District Court surrounding both the execution of the Orders and performance evinces a contractual relationship.  See Dalles Irr. Dist. v. United States, 82 Fed. Cl. 346, 356 (2008) (quoting Brooklyn Life Ins. Co. of N.Y. v. Dutcher, 95 U.S. 269, 273 (1877)) ("'There is no surer way to find out what parties meant, than to see what they have done.'"); Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1290-91 (Fed. Cir. 2008) (citations omitted) ("[T]he most accurate picture of the parties' intent for this contract is their conduct at a time when both parties still anticipated timely and full performance of the contract."); Standard Oil Co. of Cal. v. United States, 231 Ct. Cl. 112, 126 (1982) (citation omitted) ("The parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is . . . entitled to great weight in its interpretation."); Macke Co. v. United States, 199 Ct. Cl. 552, 556 (1972) ("[T]he truism that how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself."); Universal Match Corp. v. United States., 161 Ct. Cl. 418, 422 n.4 (1963) (citations omitted) ("The conduct of the parties under a contract plays an important role in interpreting it.").

Here, the Orders are bilateral contracts arising from the District Court's September 30, 2009 instructions to Tektel's president, via the procurement administrator, to sign and return the September Order, and the president's signature on both Orders in the box marked "contractor/vendor (option for bilateral signature)."   DX 001, 006.   As FAR 13.302-3(a) specifies, the contracting officer shall require written acceptance of the purchase order by the contractor when "it is desired" to consummate a binding contract between the parties before the contractor undertakes performance.   Pursuant to FAR 13.302-3(a), Tektel consummated a "binding contract" here when Tektel's president signed the Orders as instructed in the September 30, 2009 letter from the District Court's procurement administrator.[10]   Even if these Orders are not viewed as binding bilateral purchase orders, contracts would have been formed by virtue of Tektel's substantial performance of the Orders.   As this Court recognized in <u>Ulysses, Inc. v. United States</u>, a purchase order:

> [I]s an offer by the government to the supplier to buy certain supplies or services upon specific conditions.   A contract is established when the supplier accepts the order, by furnishing the supplies or services ordered or by . . . substantial performance prior to the due date.

110 Fed. Cl. 618, 637 (2013) (citations and quotation marks omitted) ("Once the offeree substantially performs, a unilateral offer is irrevocable."); <u>see also</u> FAR 13.004(b) (2006).   Here, because Tektel performed under the Orders, the contract that resulted from such performance was a contract between the party that issued the purchase orders, the District Court, and the party that performed, Tektel.

The course of performance further evinces a contract between the District Court and Tektel.   The District Court issued the Orders directly to Tektel.   The Orders expressly identified Tektel as the "contractor," and, other than describing Nortel telephone equipment, did not reference Nortel.   In its September 30, 2009 letter to Tektel, the District Court advised Tektel it had been awarded a "contract," and Tektel and the District Court began the "relationship" immediately via a telephonic conference discussing substantive details of the work Tektel was to perform.   Tektel alone performed under the Orders.   In all the correspondence surrounding Tektel's performance of these Orders, the District Court referred to Tektel as the contractor.   When the District Court canceled the contract, it addressed the termination letter solely to Tektel.   It was Tektel's conduct alone relating to the District Court's security requirements that prompted the District Court's cancelation.   Thus, even assuming that the Purchase Orders by their terms

---

[10]   The Court recognizes that the District Court's procurement administrator is not identified as a contracting officer in the record.   Nonetheless, the District Court's Manager of Administrative Services, the contracting officer, signed both Orders.   The fact that the District Court's instructions to Tektel to sign the Orders came from a different District Court official does not operate to void the bilateral contract that resulted from Tektel's president's signature.   <u>See, e.g.</u>, <u>John Reiner & Co. v. United States</u>, 163 Ct. Cl. 381, 386 (1963) ("[T]he court should ordinarily impose the binding stamp of nullity only when the illegality is plain."); <u>Warren Bros. Roads Co. v. United States</u>, 173 Ct. Cl. 714, 720 (1965) ("[A] determination should not be made that a contract is invalid unless its illegality is palpable.").

did not constitute binding bilateral agreements, this course of performance establishes that Tektel had privity of contract with the Government.

The clause in Nortel's Prime Contract purporting to disclaim privity between Tektel as a schedule partner and the Government does not alter this result.  Likewise, the clause in the Partner Agreement between Tektel and Nortel disclaiming privity between Tektel and the Government by virtue of the Partner Agreement is not controlling.  As our appellate authority recognized long ago, "[a] mere statement that a contractual relation did not exist would be ineffective if all the elements of such a relation were otherwise present."  Continental Ill. Nat. Bank & Trust Co. of Chi. v. United States, 112 Ct. Cl. 563, 566 (1949).  Moreover, the Court is not bound by agreements that are contrary to law or fact.  See Int'l Paper Co. v. United States, 39 Fed. Cl. 478, 481-82 (1997) (footnote omitted) (citing Kaminer Constr. Corp. v. United States, 203 Ct. Cl. 182, 197 (1973)) ("It is axiomatic that the parties may not stipulate the court into error, for the court may disregard any stipulation that is inadvertent, contrary to law, contrary to fact, or made without proper authority."); see also Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289 (1917) (citations omitted) ("[T]he court cannot be controlled by [an] agreement . . . on a . . . question of law.").

Finally, the Government submits as a general matter that under the Federal Supply Schedule program, there can be no privity between the Government and distributors.  Motion 15-16.  To support this sweeping assertion, the Government relies on a sentence from a 1983 article about antitrust issues in Government contracting.  Id. at 15 (citing C. Stanley Dees & Robert M. Lindquist, "Antitrust Considerations in Government Contracting," Briefing Papers (May 1983), Westlaw at 83-5 BRPAPERS 1).  This article describes the antitrust prohibition against a supplier's or manufacturer's control over a distributor's resale prices, and states in pertinent part:

> The FSS program differs from the typical commercial situation where the manufacturer does not deal directly with the ultimate consumer in that (a) prices and terms of FSS contracts may be set by the manufacturer and the Govt, and (b) there is no privity of contract (i.e., direct contractual relationship) between the Govt and the distributors.  Unless the distributor enters into its own contract with the Govt the manufacturer is ultimately responsible for complying with FSS pricing (and other) contract provisions.  In this situation--where there is a direct contractual relationship between the manufacturer and the ultimate consumer (the Govt)--some Courts have allowed restrictions on resale prices.

Id. (emphasis in original) (footnotes omitted).  Contrary to the Government's assertion, this commentary does not stand for the proposition that there can never be privity between the Government and distributors under FSS contracts, but instead recognizes that there are instances when distributors contract directly with the Government.

Exhaustion of Administrative Remedies

The Government claims that Tektel failed to exhaust its administrative remedies because it did not timely file its claim as required by the disputes clause.  When a claim arising under a contract is not subject to the Contract Disputes Act, the Court looks to the contract's disputes

clause to resolve the claim.[11]   See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1339 (Fed. Cir. 2000).  If the disputes clause provides a specific administrative remedy, "the contractor must exhaust its administrative contractual remedies prior to seeking judicial relief."  Id. at 1340 (citation omitted); Oroville-Tonasket Irr. Dist. v. United States, 33 Fed. Cl. 14, 20 (1995).

Here, the Government invokes the judiciary's disputes clause "JP3 Clause 7-235, Disputes."[12]   Under the judiciary's disputes clause, Tektel was obligated to file a written contract dispute within 12 months of the accrual of its claim.  DX 002-03, 007; Def.'s Suppl. Mot. Dismiss App. 10.  "A claim first accrues when 'all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'"  L-3 Commc'ns Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 461 (2007) (emphasis in original) (citation omitted); see Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (citations omitted) ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'").

The Government contends Tektel's claim accrued on March 18, 2010, the date on the District Court's letter to Tektel canceling the Orders.  Alternatively, the Government argues the claim accrued on March 19, 2010, the date Tektel's president learned of the cancelation during a telephone conversation with the District Court's Clerk and the District Court issued the cancelation letter.  In so arguing, the Government ignores the fact that Tektel asked the District Court to reconsider the cancelation based on new evidence it submitted on March 19, 2010.  Specifically, Tektel urged the Government to rescind the cancelation and submitted for the first time written evidence of Tektel's president's misdemeanor conviction to persuade the District Court that cancelation based on a felony conviction was unwarranted.  The record does not contain a response from the District Court to Tektel regarding this evidence of the misdemeanor or indicate when Tektel knew the District Court had rejected its argument that the evidence of the misdemeanor should vitiate the cancelation.  As such, it is unclear when Tektel knew the cancelation was effected and when the dispute regarding the cancelation accrued.

---

[11]   The Tucker Act gives the Court jurisdiction over certain disputes arising under the Contract Disputes Act.  28 U.S.C. § 1491(a)(2) (2006).  However, the CDA applies solely to executive agency contracts, not District Court contracts.  Tatelbaum v. United States, 749 F.2d 729, 730 (Fed. Cir. 1984) (citing 41 U.S.C. § 602 (1982) (current version at 41 U.S.C. § 7102 (2012))).

[12]   In the subject motion to dismiss, the Government notes that Tektel's alleged failure to exhaust its administrative remedies was the basis of the Government's January 8, 2013 motion for summary judgment.  Motion 24 n.16, Apr. 16, 2013.  Although Tektel's filing of the amended complaint rendered that motion for summary judgment moot, the Government reiterates in the pending motion that the Court should grant summary judgment on exhaustion grounds.  Id.

Even accepting that Tektel learned that the cancelation remained unrescinded as early as March 19, 2010, and the dispute accrued on March 19, 2010, Tektel still "filed" its written claim within 12 months on March 18, 2011, when it mailed its claim letter to the District Court's contracting officer via certified mail, as the postmark confirms.  The Government interprets the disputes clause to impose a more onerous burden for filing a claim than the plain language indicates, urging that a claim must be <u>received</u> within 12 months, not just filed.  The Government's argument fails because the disputes clause provides only that a claim must be "filed" within 12 months of accrual; it does not say that the contracting officer must <u>receive</u> the claim within the 12-month period following accrual.

The Government contends that Tektel's March 17, 2011 claim letter was untimely because the United States Postal Service did not deliver the claim letter until March 31, 2011.  Given that Tektel's claim was postmarked on March 18, 2011, within 12 months after the earliest date its claim could have accrued -- March 19, 2010 -- its claim was timely filed under the disputes clause.  This holding is supported by the mailbox rule -- "an act is deemed accomplished when the required submission is mailed as opposed to when it is received . . . ." <u>Irigoyen-Briones v. Holder</u>, 644 F.3d 943, 950 (9th Cir. 2011) (footnotes omitted) ("For example, a 'mail-box rule' lets us comply with the April 15 due date for tax returns by mailing them that day, and lets attorneys comply with motion and opposition deadlines by service, that is, mailing, rather than receipt or filing."); <u>see also</u> <u>Fmdiaz Constr., Inc. v. Dep't of Agric.</u>, CBCA 1870, 12-1 BCA ¶ 35,049 (citations omitted) (a notice of appeal is "filed" on the date it is mailed to the Board of Contract Appeals through the United States Postal Service).

<u>Monetary Claim</u>

The Government argues that the Court lacks jurisdiction "to grant the declaratory judgment sought by Tektel because this request is unrelated to a claim for presently-due monetary relief pending before the Court."  Motion 26-27 (citation omitted).  The Government's position lacks merit.

Since the Tucker Act is only a jurisdictional statute, a plaintiff must either demonstrate it has an express or implied contract with the United States, or invoke a source of substantive law that creates the right to money damages for claims asserted under the United States Constitution, federal statute or regulation.  <u>United States v. Testan</u>, 424 U.S. 392, 398 (1976); <u>Price v. Panetta</u>, 674 F.3d 1335, 1338 (Fed. Cir. 2012) (citations omitted); <u>Brown v. United States</u>, 86 F.3d 1554, 1559 (Fed. Cir. 1996) (citations omitted).  Where as here a plaintiff's claim is based on a contract, the plaintiff is not required to show the contract is money-mandating, only that the contract exists.  <u>Westover v. United States</u>, 71 Fed. Cl. 635, 640 (2006) (citing <u>Ont. Power Generation, Inc. v. United States</u>, 369 F.3d 1298, 1301 (Fed. Cir. 2004)).  Money-mandating inquiries are limited to non-contract claims.  <u>See</u> <u>Martinez v. United States</u>, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (citations omitted); <u>see also</u> <u>Tippett v. United States</u>, 185 F.3d 1250, 1254-55 (Fed. Cir. 1999) (citation omitted) ("When a contract is not involved, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a constitutional provision, a statute, or a regulation that provides a substantive right to money damages."), <u>abrogated on other grounds by</u> <u>Metz v. United States</u>, 466 F.3d 991 (Fed. Cir. 2006); <u>Mauras v. United States</u>, 82 Fed. Cl. 295, 298 (2008) (citation omitted) ("Only Tucker Act claims not sounding in contract must seek

money damages on the basis of a constitutional provision, statute, regulation, or executive order.").[13]

Unallowable Costs

Lastly, the Government argues that Tektel failed to state a claim for the "$121,136.76 for the custom-configured telephone switch, software, and software upgrades which Plaintiff Tektel delivered, then retrieved, from the United States District Court . . . ." Motion 31; Am. Compl. ¶ 2.  The Government argues Tektel has not presented a plausible claim for damages because Tektel offered no evidence to explain what happened to the equipment after retrieval.

A "plaintiff [must plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  Here, the Government essentially argues that Tektel will not be able to prove its claim because it cannot be entitled to compensation for equipment it retrieved. While Tektel acknowledges it retrieved the equipment from the District Court following termination of the Orders, a plaintiff can be owed for the cost of "custom-made" items if the supplied goods are "so unique that [they are] not useful" to the plaintiff.  Dairy Sales Corp. v. United States, 219 Ct. Cl. 431, 438 (1979).  Because Tektel alleged that the supplies it provided were "custom-configured," it would be premature for the Court to rule that Tektel cannot recover damages for the equipment.

## Conclusion

Defendant's Motion to Dismiss Tektel's Amended Complaint and Motion for Summary Judgment are **DENIED**.  The parties shall propose a joint schedule for further proceedings on or before **December 11, 2013**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[13]   Moreover, Tektel's claim for a conversion of its default termination to a termination for the convenience of the Government seeks monetary relief, as Tektel recognized in its demand for $123,614.26.  If the Court determines a default termination was improper, the default termination is converted into a termination for convenience, and the contractor is entitled to damages in the form of costs incurred prior to termination, a reasonable profit on work performed, and certain additional costs associated with termination.  Pinckney v. United States, 88 Fed. Cl. 490, 506 (2009) (citing Keeter Trading Co., Inc. v. United States, 79 Fed. Cl. 243, 262 (2007)).